2015 IL App (1st) 142372

FIRST DIVISION
August 17, 2015

No. 1-14-2372

| | | |
|---|---|---|
| LOUIS B. ANTONACCI, an individual, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County |
| | ) | |
| v. | ) | No. 12 L 013240 |
| | ) | |
| SEYFARTH SHAW, LLP, a Partnership, and | ) | Honorable |
| ANITA J. PONDER, an individual, | ) | Eileen M. Brewer and |
| | ) | Thomas Hogan, |
| Defendants-Appellees. | ) | Judges Presiding. |

JUSTICE HARRIS delivered the judgment of the court with opinion.
Presiding Justice Delort and Justice Cunningham concurred in the judgment and opinion.

## OPINION

¶ 1    Plaintiff, Louis B. Antonacci, appeals the order of the circuit court granting defendants Seyfarth Shaw, LLP (Seyfarth) and Anita J. Ponder's motion to dismiss his amended complaint alleging defamation *per se*, tortious interference, fraudulent misrepresentation, and promissory estoppel.  Mr. Antonacci also seeks review of the court's denial of his second petition to substitute judge for cause, and its orders quashing subpoenas served upon the City of Chicago (City) and other third parties.   On appeal, he contends the trial court erred (1) in dismissing his claim for defamation *per se* where Ms. Ponder suggested that Mr. Antonacci gave legal advice in violation of ethics rules and that Mr. Antonacci was to blame for a project being completed past the due date; (2) in dismissing his claim for tortious interference with prospective economic

advantage where Ms. Ponder told lies about him and his work resulting in the termination of his employment with Seyfarth; (3) in dismissing his claim for fraudulent misrepresentation where Seyfarth attorneys affirmatively represented to Mr. Antonacci that Ms. Ponder was a good attorney to work for, and he relied on that misrepresentation in accepting an offer employment with Seyfarth; (4) in denying his second petition for substitution of judge for cause where the trial judge displayed "favoritism and antagonism" making a "fair judgment impossible"; and (5) in quashing subpoenas he served upon the City of Chicago and other third parties.[1] For the following reasons, we affirm.

¶ 2                               JURISDICTION

¶ 3     The trial court granted defendants' motion to dismiss upon reconsideration on July 23, 2014. Plaintiff filed his notice of appeal on July 29, 2014. Accordingly, this court has jurisdiction pursuant to Illinois Supreme Court Rules 301 and 303 governing appeals from final judgments entered below. Ill. S. Ct. R. 301 (eff. Feb. 1, 1994); R. 303 (eff. May 30, 2008).

¶ 4                               BACKGROUND

¶ 5     The following facts are relevant to the issues on appeal. In August 2011, Seyfarth hired Mr. Antonacci, who was licensed to practice law in Washington, D.C., as an attorney to support Ms. Ponder, a partner in its government contracts practice group in Chicago. According to Seyfarth's offer, Mr. Antonacci's employment was "at-will" meaning "either [Mr. Antonacci] or [Seyfarth] can terminate [his] employment with or without cause or notice." Ms. Ponder

---

[1] Mr. Antonacci's brief does not address the dismissal of his claim of promissory estoppel; therefore he has waived review of that issue pursuant to Illinois Supreme Court Rule 341(h)(7) (eff. Feb. 6, 2013) ("[p]oints not argued are waived and shall not be raised in the reply brief, in oral argument, or on petition for rehearing").

assigned him to a project for the city that involved conducting interviews, research, and fact-finding.

¶ 6    The working relationship between Ms. Ponder and Mr. Antonacci became strained and on October 12, 2011, Seyfarth's professional development consultant Kelly Grofon sent an email to several members of Seyfarth's human resources staff after speaking with Ms. Ponder.    The email, which addressed Ms. Ponder's "feedback" on Mr. Antonacci, stated:

"Trying to make the most of it, but it is not working out.    Lou was hired primarily to work with her in Government Contract PG in Chicago, they even expedited hiring process.    During hiring process, she explained the project without mentioning name of client to confirm his interest in work that he would be initially doing and confirm his capability in performing it.    He assured them in process that he had significant interest in that project and developing firm's local Gov't Contract practice.    He was hired knowing his experience was not state and local, but was federal.    But, his asset was he had worked for another major law firm for a few years and would integrate well into our firm.

Shortly after he was hired, they had meetings with client that Anita thought he did not act appropriately in the sense that he was asking the wrong questions, providing advice to them, which he should not have been doing.    A. he's not licensed in IL B. he wasn't knowledgeable about local procurement C. he wasn't knowledgeable of City of Chicago's process.    Anita brought to his attention privately after meetings and Lou was very defensive.    According to her, he handled criticism very inappropriately.    He made comments undermining Anita's expertise in gov't procurement.    The relationship continued to go downhill.    He then had separate meetings with clients that Anita was

aware of, but knew he had limited time to complete project. He missed deadlines that were initially set and have now been extended by the client and Anita. Recently, he told Anita he was able to meet the deadline and do the project. Then told her he couldn't, even with assistance with a second attorney. He had assured them in the interview he could do project on his own with limited supervision, but now can't.

Anita reported this to leadership (Kevin Connelly, Dave Rowland, Kate Perrelli). Kevin spoke with Lou and the Lou didn't show up to work one day after him/Anita had agreed to meet to discuss how to move forward. Lou gave Anita a revised schedule of what he could do by the deadline date and most of it was after the deadline date. So, Anita took on much more responsibility of the project and gave much of it to a Houston attorney. She told Lou he will not be responsible anymore for the project – but, Anita did give him another assignment, in which he was trying to reach out more to her and discuss with her and show interest. The attorney in Houston had to leave town for personal issue, so Lou agreed to do some work on her behalf yesterday. Anita found out Lou had reached out to pro bono director, which she assumed was to do more work without her. Now that license issue is coming up, his attitude has changed and he appears to act more interested the last few days. Anita feels his actions have been unsettling and inconsistent with what he portrayed in the interview.

She thinks her relationship with working with him in future is highly speculative. So, she does not feel we should be going out of our way to make exceptions for him and wants to leave door open for future options.

Let me know how you think we should proceed."

¶ 7    In his amended complaint, Mr. Antonacci alleged that Ms. Ponder gave him the assignment "with an impending deadline, on which Ms. Ponder had done little or no work already."   Their working relationship was fine until September when "a discussion between Ms. Ponder and a client revealed that Ms. Ponder was wholly unaware of critical case law on the very issue on which she had been hired to provide legal guidance."   Embarrassed "that her ignorance had been exposed," Ms. Ponder criticized Mr. Antonacci and yelled at him.   She told him to review the relevant case law and prepare a memorandum summarizing the decisions.

¶ 8    On October 4, 2011, "Ms. Ponder set an arbitrary deadline of October 17, 2011, for Mr. Antonacci to present her with a substantially completed draft of the project" despite the fact the project was not due until three weeks after the deadline.   She thus gave Mr. Antonacci two weeks to complete all of the work and reserved for herself three weeks for review.   Mr. Antonacci alleged that this arbitrary deadline "was set by Ms. Ponder in a malicious attempt to criticize Mr. Antonacci and damage his career."

¶ 9    Mr. Antonacci met with Seyfarth partners Jason Stiehl and Dave Rowland for guidance. Stiehl indicated that the firm was aware of complaints against Ms. Ponder's unreasonable and unprofessional behavior, and that Ms. Ponder was "on an island" because people refused to work with her.   Rowland told him that others have found Ms. Ponder difficult to work with.   On the advice of Stiehl and Rowland, Mr. Antonacci proposed an alternative schedule to Ms. Ponder for completion of the project.   Mr. Antonacci alleged that Ms. Ponder called him into her office and proceeded "to scream at [him] in an unprofessional manner for approximately 90 minutes."   She made several accusations about his conduct and performance and although "he attempted to excuse himself from her office after 45 minutes, [she] insisted that he stay so that she could continue yelling at him for an additional 45 minutes."

¶ 10    On the advice of Rowland, Mr. Antonacci spoke with partner Mary Kay Klimesh who suggested that he prepare a comprehensive schedule for completing the project on time.    Mr. Antonacci alleged that "[u]nder the proposed schedule, [he] would be working every day and every weekend through the completion of the project, which would be well ahead of the client's deadline."   He sent the proposed schedule to Ms. Ponder who did not respond until four days later when she informed him in an email that he was no longer responsible for working on the project.    After several weeks, however, "with Ms. Ponder unable to get any other attorneys to assist her with the project, Ms. Ponder again assigned Mr. Antonacci to complete the project."

¶ 11    Mr. Antonacci alleged that Ms. Ponder made the statements in the email "to criticize Mr. Antonacci's professional judgment, diligence, and character in order to discredit him and threaten his employment, while at the same time protecting [her] reputation and employment."   He further alleged that "[u]pon information and belief, Ms. Ponder maliciously made numerous false statements concerning Mr. Antonacci to Ms. Pirelli, Ms. Gofron, Mr. Rowland, Mr. Connelly, and others."   He alleged "[u]pon information and belief," Ms. Ponder made false statements to the client Mr. Antonacci worked with, blaming Mr. Antonacci for her failure to complete the project on time.

¶ 12    Mr. Antonacci also alleged that he spoke with other partners about his concerns regarding Ms. Ponder and his continued employment with Seyfarth.   He was assured that he would continue to be employed in the firm's commercial litigation group in Chicago.   Mr. Antonacci applied to take the Illinois bar examination in July 2012 and Seyfarth reimbursed him for the filing fee he paid to take the exam.   He actively sought work with other attorneys at Seyfarth and his performance evaluations from those partners were "uniformly positive."   Mr. Antonacci also declined an offer from a recruiter to apply as a candidate for an associate position with a law

firm in Washington, D.C. Despite these assurances, on May 22, 2012, Mr. Antonacci's employment with Seyfarth was terminated and he was told to be out of the office by midnight. Mr. Antonacci alleged the reason given for his termination was that he had been hired to work for Ms. Ponder and "we all know how that worked out."

¶ 13 Mr. Antonacci filed a four-count complaint against Seyfarth and Ms. Ponder, alleging (1) defamation *per se* based on the Ponder email, (2) intentional interference with prospective economic advantage based on the defamatory statements, (3) fraudulent misrepresentation based on statements and omissions made when he interviewed with Seyfarth, and (4) promissory estoppel based on assurances made regarding his job security at Seyfarth. Defendants filed a motion to dismiss pursuant to section 2-619.1 of the Code of Civil Procedure (Code) (735 ILCS 5/2-619.1 (West 2010)), which the trial court granted. The trial court dismissed the defamation and intentional interference counts without prejudice, with leave to replead, and dismissed the fraudulent misrepresentation and promissory estoppel counts with prejudice.

¶ 14 Two weeks later, Mr. Antonacci filed a motion requesting that the trial judge, Judge Eileen Brewer, recuse herself from the proceedings because she was biased against him. Judge Brewer denied the motion, and Mr. Antonacci filed a petition for substitution of judge for cause. In the petition, Mr. Antonacci alleged that Judge Brewer demonstrated "personal bias and prejudicial conduct, which prevents the parties from receiving a fair consideration of the matters at issue." After briefing and oral argument, Judge Lorna Propes denied the petition finding that Judge Brewer did not demonstrate actual prejudice or bias.

¶ 15 While the substitution of judge petition was pending, Mr. Antonacci filed his amended complaint, repleading counts I and II for defamation *per se* and tortious interference respectively, and repleading counts III and IV to preserve them for appeal. Defendants moved to dismiss the

amended complaint pursuant to section 2-619.1, arguing that a qualified privilege exists as a matter of law for employment evaluations. Before the hearing on defendants' motion, Mr. Antonacci filed a motion for leave to file a surreply which he presented on December 5, 2013, one day before the scheduled hearing. The motion also requested sanctions against defendants' counsel for alleged misrepresentation of law and facts in their reply brief. The trial court did not grant Mr. Antonacci's motions and after oral argument, dismissed with prejudice his tortious interference claim pursuant to section 2-615 of the Code (735 ILCS 5/2-615 (West 2010)). However, the trial court denied the motion to dismiss as to count I, defamation *per se*, finding Mr. Antonacci's claim that Ms. Ponder stated he should not have given advice sufficiently alleged that "Plaintiff had engaged in the unauthorized practice of law." Both parties filed motions for reconsideration.

¶ 16    Meanwhile, Mr. Antonacci served subpoenas on the city seeking depositions of employees Stephen Patton and Jamie Rhee, and documents that may show Ms. Ponder made defamatory statements about him to the city. He also served a subpoena on the company, Toomey Reporting, Inc., and its court reporter whom he hired to transcribe the December 5, 2013, hearing on his motion for leave to file a surreply. Mr. Antonacci sought to discover whether Seyfarth's counsel requested that the court reporter alter the transcript so that the trial court did not appear biased against him. Additionally, he sought forensic examination of the court reporter's audio recording device and laptop.

¶ 17    The city, Toomey, and the court reporter filed motions to quash. The trial court granted the city's motion but ordered an *in camera* review of certain documents referring to Seyfarth's request for an extension of the deadline on the project worked on by Mr. Antonacci. Mr. Antonacci alleged that he never saw the documents ordered for *in camera* review. After

hearing cross motions regarding the subpoena request on the court reporter, the trial court allowed an audio recording of the December 5, 2013, hearing to be played and the recording matched the transcript. Mr. Antonacci alleged that "[t]he transcript did not reflect [his] recollection of the proceedings." Specifically, it "did not reflect Judge Brewer's express refusal to consider the Affidavits submitted by Mr. Antonacci pursuant to Section 2-619(c)" nor did it reflect "Judge Brewer's erratic, periodic screaming at Mr. Antonacci throughout the proceeding 'I'M NOT LOOKING AT IT!' " The trial court found Mr. Antonacci's statements and allegations "outrageous" and denied his request for forensic examination of the equipment. The trial court granted the motions to quash.

¶ 18    Four days later, Mr. Antonacci filed his second petition for substitution of judge for cause. He again alleged that Judge Brewer was biased against him as evidenced by her recent rulings against him, and added that her bias resulted from "her political affiliations and professional relationships" which were "inextricably intertwined with" Ms. Ponder and the city. Specifically, Mr. Antonacci alleged that Judge Brewer was an attorney for the city's law department from 1988 to 1994, while Ms. Ponder worked for the city's Department of Procurement Services from 1984 to 1989, and was director of contract compliance from 1986 to 1989. He also alleged they had connections through Cook County board presidents John Stroger and Bobbie Steele. The petition was heard before Judge Thomas Hogan on December 6, 2013. At the hearing, Judge Brewer unequivocally stated, "I do not know Anita Ponder." Mr. Antonacci alleged, however, that when he delivered to Judge Brewer a draft affidavit asking her to attest to the fact that she did not know Ms. Ponder, Judge Brewer refused to do so. Judge Hogan subsequently denied the petition for substitution of judge for cause.

¶ 19    With the motions for reconsideration before it, the trial court denied Mr. Antonacci's motion and granted defendants' motion.   It found Ms. Ponder's statement that Mr. Antonacci should not have been giving advice could be construed innocently, and allowed Mr. Antonacci leave to replead his defamation *per se* count.   He waived amendment and stood on his pleading. The trial court then issued its written ruling and dismissed the amended complaint with prejudice.   Mr. Antonacci filed this timely appeal.

¶ 20                                    ANALYSIS

¶ 21    Defendants filed their motion to dismiss pursuant to section 2-619.1 of the Code, which combines a section 2-615 motion to dismiss based upon insufficient pleadings with a section 2-619 motion to dismiss based upon certain defects or defenses.   735 ILCS 5/2-619.1 (West 2010).   In a motion to dismiss under either section, the court must accept all well-pleaded facts in the complaint as true and draw all reasonable inferences in favor of the nonmoving party. *Edelman, Combs & Latturner v. Hinshaw & Culbertson*, 338 Ill. App. 3d 156, 164 (2003). Also, exhibits attached to the complaint are a part of the complaint and if a conflict exists between facts contained in the exhibits and those alleged in the complaint, factual matters in the exhibits control.   *Charles Hester Enterprises, Inc. v. Illinois Founders Insurance Co.*, 114 Ill. 2d 278, 287 (1986).   Furthermore, this court reviews the determination of the trial court, not its reasoning, and therefore we may affirm on any basis in the record whether or not the trial court relied on that basis or its reasoning was correct.   *Leonardi v. Loyola University of Chicago*, 168 Ill. 2d 83, 97 (1995).   We review the trial court's determination on motions to dismiss pursuant to sections 2-615 and 2-619 *de novo*.   *Edelman*, 338 Ill. App. 3d at 164.

¶ 22    Mr. Antonacci first alleges that the trial court erred in dismissing his claim for defamation *per se*.   To state a claim for defamation, the plaintiff must allege "facts showing that

the defendant made a false statement about the plaintiff, that the defendant made an unprivileged publication of that statement to a third party, and that this publication caused damages." *Green v. Rogers*, 234 Ill. 2d 478, 491 (2009). A defamatory statement damages the plaintiff's reputation in that it lowers the person in the eyes of the community or deters the community from associating with him. *Id*.

¶ 23 "A statement is defamatory *per se* if its harm is obvious and apparent on its face." *Id*. Five categories of statements are considered defamatory *per se*: (1) words imputing that a person has committed a crime; (2) words imputing that a person is infected with a loathsome communicable disease; (3) words imputing a person cannot perform or lacks integrity in performing employment duties; (4) words imputing a person lacks ability or otherwise prejudices him in his profession; and (5) words imputing a person has engaged in adultery or fornication. *Id*. at 491-92. A claim for defamation *per se* must plead the substance of the statement with sufficient particularity and precision so as to permit judicial review of the defamatory content. See *Mittelman v. Witous*, 135 Ill. 2d 220, 229-30 (1989), *abrogated on other grounds by Kuwik v. Starmark Star Marketing & Administration, Inc.*, 156 Ill. 2d 16 (1993).

¶ 24 Even if an alleged statement falls into a defamation *per se* category, it is not *per se* actionable if it is reasonably capable of an innocent construction. *Bryson v. News America Publications, Inc.*, 174 Ill. 2d 77, 90 (1996). Pursuant to the innocent construction rule, the court considers the statement in context and gives the words of the statement, and any implications arising therefrom, their natural and obvious meaning. *Id*. Furthermore, "a statement 'reasonably' capable of a nondefamatory interpretation, given its verbal or literary context, should be so interpreted. There is no balancing of reasonable constructions ***." *Mittelman*, 135 Ill. 2d at 232. However, when the defendant clearly intended or unmistakenly

No. 1-14-2372

conveyed a defamatory meaning, "a court should not strain to see an inoffensive gloss on the statement." *Green*, 234 Ill. 2d at 500. The preliminary construction of an allegedly defamatory statement is a question of law we review *de novo*. *Tuite v. Corbitt*, 224 Ill. 2d 490, 511 (2006).

¶ 25    On appeal, Mr. Antonacci contends that defendants made the following defamatory statements against him based on Ms. Ponder's email to Ms. Grofon: (1) he engaged in the unauthorized practice of law by giving legal advice when he was not licensed to practice in Illinois; (2) he was incapable of performing his job as evidenced by the missed deadlines, his lack of enthusiasm for projects Ms. Ponder assigned to him, and his lack of time management skills; (3) he misrepresented that "he could waive into the bar of the State of Illinois prior to" being hired; (4) he failed to show up for work on a day he was supposed to meet with Ms. Ponder about the city project; and (5) he concealed the fact that he had spoken to Seyfarth's pro bono director. Mr. Antonacci also alleges that, "[u]pon information and belief, Ms. Ponder maliciously made numerous false statements concerning [him] to Ms. Pirelli, Ms. Gofron, Mr. Rowland, Mr. Connelly and others subsequent to" the email, and "[u]pon information and belief," she also made such statements to the client, city of Chicago. He alleges that the statements Ms. Ponder made "blamed Mr. Antonacci for her failure to complete her project in a timely and effective manner."

¶ 26    As shown by Ms. Ponder's email reproduced above, Ms. Ponder stated that she "thought [Mr. Antonacci] did not act appropriately in the sense that he was asking the wrong questions, providing advice to them, which he should not have been doing" since he was not licensed in Illinois, nor was he "knowledgeable about local procurement" or "City of Chicago's process." If the statement that Mr. Antonacci improperly provided advice while not licensed in Illinois

- 12 -

implies he engaged in the unauthorized practice of law, it may be actionable as defamation *per se* since it questions his integrity in the performance of his profession. Defendants argue, however, that the mere act of providing legal advice while not currently state-licensed is not necessarily an unauthorized practice of law.

¶ 27 Rule 5.5(c)(1) of the Illinois Rules of Professional Conduct (Ill. R. Prof Conduct (2010) R. 5.5(c)(1) (eff. Jan. 1, 2010)) provides that "[a] lawyer admitted in another United States jurisdiction, and not disbarred or suspended from practice in any jurisdiction, may provide legal services on a temporary basis in this jurisdiction that *** are undertaken in association with a lawyer who is admitted to practice in this jurisdiction and who actively participates in the matter." At the time Mr. Antonacci allegedly provided the advice, he was licensed in Washington D.C. and working on a project assigned to him by Ms. Ponder, who is presumably licensed in Illinois. Ms. Ponder actively participated in the project. As such, Mr. Antonacci engaged in no wrongdoing and the statement referring to his actions is therefore not defamatory. Additionally, the statement could be viewed as an expression of opinion protected from claims of defamation *per se*. See *Solaia Technology, LLC v. Specialty Publishing Co*., 221 Ill. 2d 558, 581 (2006); *Pompa v. Swanson*, 2013 IL App (2d) 120911, ¶ 22. Ms. Ponder could be stating her opinion that in light of the fact that Mr. Antonacci had not yet taken the Illinois bar examination, and given his inexperience in local procurement and the city's process, he should not have rendered certain advice to the city. Dismissal of this claim was proper.

¶ 28 As for Mr. Antonacci's remaining allegations of defamation *per se* based on Ms. Ponder's email, those statements are capable of an innocent construction read in context of the email as a whole and given the purpose of the correspondence. *Tuite*, 224 Ill. 2d at 512 (the innocent construction rule requires that a writing be read " 'as a whole' " (quoting *John v. Tribune Co.*, 24

Ill. 2d 437, 442 (1962)). Ms. Ponder's email, read as a whole, addressed Mr. Antonacci's working relationship with her and his fit as an employee of Seyfarth. In his interview, Mr. Antonacci assured the firm that he was capable of, and interested in, performing work for Ms. Ponder. He was hired primarily to work with her in the government contract group of the firm. In considering him for the position, Seyfarth knew that Mr. Antonacci's experience was at the federal, rather than state or local, level. However, he assured Seyfarth that he could work on projects alone and, given his background with large firms, defendants believed he "would integrate well into the firm."

¶ 29    Ms. Ponder soon discovered that Mr. Antonacci's experience was not a good fit with the job at Seyfarth. Mr. Antonacci scheduled "separate meetings with clients" when he "knew he had limited time to complete project." He "missed deadlines" and Ms. Ponder had to ask for an extension. Mr. Antonacci gave her a "revised schedule of what he could do by the deadline date and most of it was after the deadline date." She had to assign the project to another attorney. Ms. Ponder gave Mr. Antonacci another assignment, and he reached out to her and showed interest. However, she also "found out" that Mr. Antonacci "had reached out to pro bono director, which she assumed was to do more work without her." With the licensing issue approaching, Mr. Antonacci's attitude "changed and he appears to act more interested." Ms. Ponder felt that "his actions have been unsettling and inconsistent with what he portrayed in the interview." She believed that the future of their working relationship "is highly speculative" and felt that Seyfarth should not "be going out of our way to make exceptions for him and wants to leave door open for future options."

¶ 30    Each of these statements was specifically confined to the context of Mr. Antonacci's working relationship with Ms. Ponder and his fit with Seyfarth, and the audience for the email

was limited to several human resources personnel.  In this context, we cannot reasonably conclude that Ms. Ponder's statements accused Mr. Antonacci of actions and misconduct that imputes a general lack of integrity in the performance of his duties as a lawyer or prejudices him. Rather, the more reasonable conclusion is that Ms. Ponder stated her belief that Mr. Antonacci was not a good fit with Seyfarth and did not work well with her.   The statements are reasonably capable of an innocent construction and therefore they are not defamatory *per se*.   *Green*, 234 Ill. 2d at 502-03.

¶ 31    Mr. Antonacci disagrees, arguing that Ms. Ponder made those statements "to criticize [his] professional judgment, diligence, and character in order to discredit him and threaten his employment, while at the same time protecting [her] reputation and employment."   He supports his argument with allegations that she was embarrassed that the client discovered her "ignorance" of critical case law, gave Mr. Antonacci arbitrary deadlines that were difficult to meet, and yelled at him "in an unprofessional manner for approximately 90 minutes."   However, under the innocent construction rule, we consider the written statement in context and give the words of the statement, and any implications arising therefrom, their natural and obvious meaning.   *Bryson*, 174 Ill. 2d at 90.   Notwithstanding Mr. Antonacci's unsupported allegations that Ms. Ponder lied about the events described in the email, the natural and obvious meaning of the statements are reasonably capable of innocent construction and should be so interpreted.   *Mittelman*, 135 Ill. 2d at 232.

¶ 32    Mr. Antonacci also alleges that, "[u]pon information and belief, Ms. Ponder maliciously made numerous false statements concerning [him] to Ms. Pirelli, Ms. Gofron, Mr. Rowland, Mr. Connelly and others subsequent to" the email, and "[u]pon information and belief," she also made such statements to the client, City of Chicago.   In *Green*, our supreme court determined

that in a claim for defamation *per se*, where actual damages need not be alleged, the plaintiff must plead with "a heightened level of precision and particularity" to protect defendants from baseless claims of serious wrongdoing. *Green*, 234 Ill. 2d at 495. The supreme court did not favor the use of the phrase, "upon information and belief," but found that pleadings based "upon information and belief" could survive dismissal if the plaintiff sufficiently pleads the factual basis informing his belief. *Id*. Here, Mr. Antonacci does not specify what was said to these parties, how the statements were made or when they were made. As such, his "pleadings do not allege sufficient facts to state a cause of action for defamation *per se* and the trial court properly dismissed" the claim. *Grundhoefer v. Sorin*, 2014 IL App (1st) 131276, ¶ 23.

¶ 33 Since the trial court properly dismissed Mr. Antonacci's claim for defamation *per se*, it follows that he cannot maintain his claim for tortious interference. See *Jacobson v. CBS Broadcasting, Inc.*, 2014 IL App (1st) 132480, ¶ 54 ("In light of the fact that plaintiff's actions for defamation, false light, and invasion of privacy have been rejected, those actions can no longer serve as a basis for her claims of *** tortious interference with a business expectation."). Furthermore, the issue of whether the trial court erred in quashing subpoenas seeking depositions and documents that may show Ms. Ponder made defamatory statements about him to the city is now moot. A reviewing court will not decide moot questions, or consider issues not essential to the disposition of the causes before it. *Condon v. American Telephone & Telegraph Co.*, 136 Ill. 2d 95, 99 (1990).

¶ 34 Mr. Antonacci next contends that the trial court erred in dismissing his fraudulent misrepresentation claim against defendants. He alleges that when he interviewed for the position at Seyfarth, the firm's attorneys assured him that "Ms. Ponder was a good person for whom to work and that other Seyfarth attorneys actively sought to work with her." However,

he soon discovered that Ms. Ponder was "unreasonable, vindictive, and unable to manage people or projects *** which led to his ultimate termination." To plead and prove a claim for fraudulent misrepresentation, a plaintiff must show: (1) a false statement of material fact; (2) the party making the false statement knew of its falsity; (3) an intent to induce the other party to act; (4) the other party reasonably relied on the truth of the statement; and (5) the other party suffered damages resulting from such reliance. *Neptuno Treuhand-Und Verwaltungsgesellschaft MBH v. Arbor*, 295 Ill. App. 3d 567, 571 (1998).

¶ 35    A statement of opinion, however, cannot form the basis of an action for fraudulent misrepresentation. *Id*. at 572. " 'A representation is one of opinion rather than fact if it only expresses the speaker's belief, without certainty, as to the existence of a fact.' " *Id*. at 571 (quoting *Marino v. United Bank of Illinois, N.A.*, 137 Ill. App. 3d 523, 527 (1985)). A comment to section 538A of the Restatement (Second) of Torts states that "[o]ne common form of opinion is a statement of the maker's judgment as to quality, value, authenticity or similar matters as to which opinions may be expected to differ." Restatement (Second) of Torts § 538A cmt. b, at 83 (1977). A statement that a person is "[i]ntelligent, industrious and innovative" is an opinion that describes personal qualities, "and whether they exist in a given individual is a matter upon which individual judgment may be expected to differ." *Arbor*, 295 Ill. App. 3d at 572. Similarly, the statement that Ms. Ponder was a good person to work for and whom others actively sought to work with, is one of opinion. Therefore, it cannot form the basis of an action for fraudulent misrepresentation and the trial court properly dismissed this claim. *Id*.

¶ 36    Additionally, given the unambiguous terms of Mr. Antonacci's employment contract with Seyfarth, it was not reasonable for him to rely on representations regarding the security of his

employment. When interpreting a contract, a court's primary objective is to ascertain the intent of the parties at the time they executed the contract. *Owens v. McDermott, Will & Emery*, 316 Ill. App. 3d 340, 344 (2000). Where the contract's language is clear and unambiguous, we must ascertain the parties' intent exclusively through the contract's terms given their plain and ordinary meaning. *Id.* According to Mr. Antonacci's employment contract with Seyfarth, his employment was "at-will" meaning "either [Mr. Antonacci] or [Seyfarth] can terminate [his] employment with or without cause or notice." An employer may terminate an at-will employee "for any reason or for no reason" so long as the termination does not violate "clearly mandated public policy." *Barr v. Kelso-Burnett Co.*, 106 Ill. 2d 520, 525 (1985).

¶ 37 Mr. Antonacci's final contention is that the trial court erred in denying his second petition for substitution of judge. He argues that during the proceedings, Judge Brewer "displayed a deep-seated favoritism and antagonism that would make fair judgment impossible." A trial judge is presumed to be impartial, and the challenging party bears the burden of overcoming this presumption. *Eychaner v. Gross*, 202 Ill. 2d 228, 280 (2002). Allegations of judicial bias or prejudice are viewed in context and evaluated in terms of the judge's specific reaction to the situation at hand. *People v. Jackson*, 205 Ill. 2d 247, 277 (2001). A determination to disqualify a judge due to bias or prejudice is not " 'a judgment to be lightly made.' [Citation.]" *Eychaner*, 202 Ill. 2d at 280.

¶ 38 Mr. Antonacci alleges that Judge Brewer was biased as evidenced by her recent rulings against him and that her bias resulted from "her political affiliations and professional relationships" which were "inextricably intertwined with" Ms. Ponder and the city. Mr. Antonacci alleged that Judge Brewer was an attorney for the city's law department from 1988 to 1994, while Ms. Ponder worked for the city's Department of Procurement Services from 1984 to

1989, and was director of contract compliance from 1986 to 1989. He also alleged they had connections through Cook County board presidents John Stroger and Bobbie Steele. However, at the hearing on his petition, Judge Brewer unequivocally stated, "I do not know Anita Ponder." Even if she had known her, that fact alone is not enough to disqualify Judge Brewer from presiding over the case. "It is generally held that a judge need not disqualify [herself] just because a friend appears before [her] in court." *People v. Buck*, 361 Ill. App. 3d 923, 933 (2005) (trial judge not necessarily disqualified from presiding over a case where one of the attorneys supported his election campaign in the past, but did not donate money or actively participate in the campaign).

¶ 39    As for Judge Brewer's rulings against him, "[a] judge's rulings alone almost never constitute a valid basis for a claim of judicial bias or partiality." *Eychaner*, 202 Ill. 2d at 280. Mr. Antonacci also refers to Judge Brewer's antagonism toward him during the proceedings, particularly at the December 5, 2013, hearing where he asked to submit his surreply. Mr. Antonacci contends that Judge Brewer's expressly refused to consider the affidavits he submitted pursuant to section 2-619(c), and she would erratically and periodically scream at him throughout the proceeding, "I'M NOT LOOKING AT IT!" The transcript of the hearing, however, reflects only Judge Brewer's frustration with Mr. Antonacci's attempt to submit a surreply one day before the hearing and at no point does she scream, "I'M NOT LOOKING AT IT." A display of displeasure or irritation with an attorney's behavior is not necessarily evidence of judicial bias against a party or his counsel. *Jackson*, 205 Ill. 2d at 277. There is no evidence in the record that Judge Brewer acted in a hostile manner or was biased against Mr. Antonacci due to her alleged connection with Ms. Ponder, and the trial court properly dismissed this claim.

¶ 40    Mr. Antonacci contends, without citation to authority, that the trial court erred in quashing the subpoenas he served upon Toomey and court reporter Peggy Anderson. He argues

that the discovery he requests will tend to prove that the transcript of the December 5, 2013, hearing "was fraudulently altered" to delete "Judge Brewer's hostile outbursts" toward him and will bolster his petition for substitution of judge for cause. A reviewing court will not overturn the trial court's discovery order absent an abuse of discretion. *Wisniewski v. Kownacki*, 221 Ill. 2d 453, 457 (2006). A discovery request must meet the threshold requirement of relevance to the matters at issue in the case, and the trial court should deny discovery where insufficient evidence is shown that the discovery is relevant. *Dei v. Tumara Food Mart, Inc.*, 406 Ill. App. 3d 856, 866 (2010). Although the trial court here quashed Mr. Antonacci's subpoena requests, it did allow the parties to hear the audio recording of the December 5, 2013, hearing from the court reporter's computer. There is no dispute that the transcript of the hearing matched the audio recording. Mr. Antonacci's request for further discovery amounts to an improper " 'fishing expedition' " conducted " 'with the hope of finding something relevant.' [Citation.]" *Fabiano v. City of Palos Hills*, 336 Ill. App. 3d 635, 659 (2002). The trial court did not abuse its discretion in denying this discovery request. *Id*.

¶ 41    Mr. Antonacci also argues in his brief that the trial court erred in denying his motion for leave to file a surreply *instanter*. However, he provides very little analysis and no support from case law. He cites section 2-1007 of the Code for the proposition that the trial court may extend time to do any act, upon good cause shown, prior to entry of judgment, but the cases he cites in support of his argument, *Sullivan v. Power Construction, Inc.*, 108 Ill. App. 3d 653 (1982) and *Grossman Clothing Co.*, *v. Gordon*, 110 Ill. App. 3d 1063 (1982), are not section 2-1007 cases. Therefore, pursuant to Rule 341(h)(7), he has forfeited the issue for review.

¶ 42    For the foregoing reasons, the judgment of the circuit court is affirmed.

¶ 43    Affirmed.

# REPORTER OF DECISIONS - ILLINOIS APPELLATE COURT

LOUIS B. ANTONACCI, an individual,

Plaintiff-Appellant,

v.

SEYFARTH SHAW, LLP, a partnership, and
ANITA J. PONDER, an individual,

Defendants-Appellees.

No. 1-14-2372

Appellate Court of Illinois
First District, First Division

August 17, 2015

JUSTICE HARRIS delivered the judgment of the court with opinion.
Presiding Justice Delort and Justice Cunningham concurred in the judgment and opinion.

Appeal from the Circuit Court of Cook County.

The Honorable Eileen M. Brewer and Thomas Hogan, Judges Presiding.

Law Offices of Louis B. Antonacci, 360 H Street NE, Unit 334, Washington, DC
20002, (Louis B. Antonacci, of counsel), for APPELLANT.

Perkins Coie LLP, 131 South Dearborn Street, Suite 1700, Chicago, IL
60603, (Matthew J. Gehringer and Bates McIntyre Larson, of counsel), for APPELLEES.

Stephen R. Patton, Corporation Counsel of the City of Chicago, 30 North LaSalle Street,
Suite 800, Chicago, IL 60602, (Benna Ruth Solomon, Myriam Zreczny Kasper and
Suzanne M. Loose, of counsel), for NON-PARTY APPELLEE *City of Chicago*.